UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

RICHARD FRIEDMAN and CARLA HIRSCHORN,        15-cv-5899 (JGK)
ET AL.,
                                             OPINION AND ORDER
                      Plaintiffs,

        -against-

JP MORGAN CHASE & CO., JP MORGAN CHASE
BANK, N.A., J.P. MORGAN SECURITIES LLC,
and J.P. MORGAN SECURITIES LTD.; JOHN
HOGAN and RICHARD CASSA,

                      Defendants.
————————————————————————

JOHN G. KOELTL, District Judge:

        This is a class action brought by Richard Friedman and

Carla Hirschorn on behalf of investors in Bernard L. Madoff's

Ponzi scheme who withdrew more money from the Ponzi scheme than

they invested (the "plaintiffs" or "net winners"). The

plaintiffs bring the case against JP Morgan Chase & Co., JP

Morgan Chase Bank, J.P. Morgan Securities LLC, and J.P. Morgan

Securities, Ltd. (together "JP Morgan"), and two JP Morgan

employees, John Hogan and Richard Cassa (the "individual

defendants"). On March 28, 2014, the plaintiffs filed this

action in the District of New Jersey, alleging that the

defendants were actively complicit in the illegal conduct of

Madoff and Bernard L. Madoff Investment Securities LLC

("BLMIS"). This case was transferred to the Southern District of

New York on July 28, 2015. The defendants now move to dismiss all the claims.

The Second Amended Complaint ("SAC"), filed October 3, 2014, Dkt. No. 33, alleges that Madoff and BLMIS violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and asserts that the defendants, as control persons of BLMIS and Madoff, are liable for BLMIS's and Madoff's Section 10(b) and Rule 10b-5 violations pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Count 1" or the "Section 20(a) claim") and the New Jersey Uniform Securities Law, N.J.S.A. §§ 49:3-47, et seq. ("Count 2" or the "NJUSL claim"). The SAC also asserts several additional state law causes of action against the defendants: Counts 3 through 8 allege claims of aiding and abetting Madoff's embezzlement and breach of fiduciary duty, unjust enrichment, breach of fiduciary duty, commercial bad faith, and gross negligence. The plaintiffs also allege that the defendants violated the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("Count 9" or the "Federal RICO Claim") and New Jersey's Racketeer Influenced and Corrupt Organizations Act, N.J.S.A. 2C:41-2 et seq. ("Count 10" or the "New Jersey RICO Claim").

This court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa, 18 U.S.C. § 1964, 28 U.S.C. § 1331, and 28 U.S.C. § 1367. Pursuant to Federal Rules of Civil Procedure 9(b), 12 (b)(1), and 12(b)(6), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4 et seq. ("PSLRA"), and the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb(f)(1) et seq. ("SLUSA"), the defendants move to dismiss the SAC.[1] The defendants argue, among other bases for dismissal, that the federal claims are time-barred and fail to state a claim, and that the state claims are barred by SLUSA and that the Court should, in any event, decline to exercise supplemental jurisdiction over them. For the reasons explained below, the motion is granted.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to

---

[1] While the defendants have brought a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, there is plainly subject matter jurisdiction to decide whether the allegations in the SAC have properly alleged causes of action under federal statutes. The only plausible motion under Rule 12(b)(1) is that if the federal causes of action are dismissed, the Court should decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state causes of action.

weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should not be dismissed if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 57 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While factual allegations should be construed in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

Claims under the Exchange Act that sound in fraud must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the PSLRA, 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that a complaint in a private action in

4

which the plaintiff may recover damages based on the defendant's state of mind "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)-(2); ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 607-08 (S.D.N.Y. 2015).

## II.

The following facts alleged in the SAC are accepted as true for purposes of the defendants' motion to dismiss.

The SAC incorporates, among other things, the Statement of Facts from JP Morgan's global settlement with the United States Attorney's Office for the Southern District of New York. As part

of the global settlement, JP Morgan entered into a Deferred
Prosecution Agreement to resolve charges against JP Morgan
brought under the Currency and Foreign Transactions Reporting
Act of 1970, 31 U.S.C. § 5311 et seq. (also known as the "Bank
Secrecy Act"). SAC, Ex. C.

**A.**

It is now common knowledge that Madoff ran the largest
Ponzi scheme in history through BLMIS and its predecessors and
affiliates. At the time of its collapse in December 2008, BLMIS
maintained more than 4,000 investment advisory client accounts
and purported to have a balance of approximately $65 billion
under management. In reality, BLMIS only had approximately $300
million in assets, including $234 million in a JP Morgan bank
account. SAC, Ex. C ¶ 7. Madoff and BLMIS had a continuous
banking relationship with JP Morgan and its predecessor
institutions. SAC, Ex. C ¶ 8. Madoff originally opened an
account at Chemical Bank, a JP Morgan predecessor, in 1986, and
for decades in the course of the Ponzi scheme, Madoff and BLMIS
deposited billions of dollars from investors in an account at JP
Morgan known as the 703 Account. SAC ¶¶ 5, 184; SAC, Ex. C ¶ 9.
The funds in the 703 Account were not used for the purchase and
sale of stocks, bonds, options or other securities. SAC, Ex. C.
¶ 10.

JP Morgan Chase is a financial holding company incorporated under Delaware law with its principal place of business in New York. SAC ¶ 17. The other JP Morgan defendants are subsidiaries of JP Morgan Chase: (1) JP Morgan Chase Bank has its principal place of business in Ohio, SAC ¶ 18; (2) J.P. Morgan Securities LLC is organized under Delaware law and is the principal non-bank subsidiary of JP Morgan Chase, SAC ¶ 19; (3) J.P. Morgan Securities Ltd. is organized under English law and is the investment banking arm of JP Morgan Chase in the United Kingdom, SAC ¶ 21. John Hogan is a JP Morgan employee who held several positions in which he oversaw the risk of Chase's Investment Bank's credit business, rising to the level of Chief Risk Officer and later Chairman of Risk for all JP Morgan Chase. SAC ¶ 22. Richard Cassa was the sponsor or Client Relationship Manager for one of the Madoff and BLMIS accounts from 1993 to March 2008 when he retired. SAC ¶ 23.

The SAC alleges that Cassa received reports from other JP Morgan employees that revealed irregularities in the Madoff account, including unexplained checks between Norman Levy and Madoff for huge sums of money, and that Cassa was aware of misrepresentations made by BLMIS in reports to the SEC. SAC ¶ 23. The SAC also alleges that Hogan knew Madoff was rumored to be operating a Ponzi scheme and that Cassa knew that the BLMIS

account did not hold as much money as it was purported to hold. SAC ¶ 23.

The SAC alleges that JP Morgan had certain obligations under the Bank Secrecy Act, to monitor customer transactions, report suspicious activities, and guard against money laundering. SAC ¶ 66; 31 U.S.C. § 5318(a)(2). The Bank Secrecy Act provides that banks must implement a compliance program to monitor customer transactions and report suspicious transactions relevant to a possible violation of law or regulation. Id. § 5318(g)(1), (h)(1). The SAC alleges that JP Morgan failed to comply with its duties under the Bank Secrecy Act, and did not file suspicious activity reports related to Madoff's business until after Madoff was arrested in December 2008. SAC ¶ 112. The SAC also enumerates the different settlements JP Morgan has entered into with the United States Government, other regulatory agencies and governments, and private litigants, arguing that these settlements show that JP Morgan has a corporate culture of thievery. SAC ¶¶ 69-97.

According to the SAC, Madoff and BLMIS deposited funds in the 703 JP Morgan Account, and embezzled billions of dollars until December 2008. SAC ¶ 98. The SAC alleges that JP Morgan was aware that BLMIS and Norman Levy, a JP Morgan and BLMIS customer, were engaged in illegal transfers. SAC ¶¶ 101-02. Levy

and BLMIS repeatedly transferred large sums of money to each other on a daily basis, and the transfers were allegedly eight times greater than the combined transfers of all other BLMIS customers. SAC ¶¶ 104-05, 109. The amount of the transfers in December 2001 reached $6.8 billion. SAC ¶ 165. The transfers had the effect of making the BLMIS balance in the JP Morgan account appear much larger than it actually was.  The practice continued until 2002 when Hogan told Madoff the transfers had to stop. SAC ¶ 106. The SAC alleges, however, that JP Morgan did not report the illegal transactions or take steps to shut down BLMIS's and Madoff's accounts because it profited from the transactions. SAC ¶¶ 110-11, 114.

The SAC further alleges that BLMIS was required under SEC Rule 17a-5 to file quarterly Financial and Operational Combined Uniform Single ("FOCUS") reports with the SEC. SAC ¶ 118. JP Morgan allegedly received the FOCUS reports, and would have allegedly known that the funds disclosed in the FOCUS reports differed from the funds BLMIS held at JP Morgan. SAC ¶ 119. According to the SAC, JP Morgan made a loan to BLMIS in the amount of $95 million and would have known that the FOCUS report falsely reflected that BLMIS had no outstanding bank loans. SAC ¶ 120. JP Morgan Chase made several additional loans to the BLMIS account, and earned more than $3.4 million in interest on

the loans from November 2005 to May 2006. SAC ¶¶ 124-30. None of these loans were reflected in the FOCUS Reports, and the SAC alleges that JP Morgan allegedly knew that BLMIS and Madoff were not reporting all assets and liabilities as required by the SEC. SAC ¶ 133; see also SAC ¶ 173.

The SAC further alleges that BLMIS underreported its cash on hand in the FOCUS Reports, and that JP Morgan was in a position to know that BLMIS did not disclose the full amount of its cash on hand. SAC ¶¶ 135-36, 169. JP Morgan also allegedly failed to conduct due diligence on BLMIS before approving a request for a collateralized $100 million loan. SAC ¶¶ 140-41.

The SAC alleges that JP Morgan's banking relationship with Madoff was a necessary part of the scheme by Madoff and BLMIS and that JP Morgan "ignored the fact that the activity in BLMIS's 703 Account could not have been linked to a legitimate business." SAC ¶ 155. The SAC alleges that if JP Morgan believed the 703 Account was used for market making and was part of Madoff's purported business of structuring trades for the BLMIS customers, then JP Morgan should have seen transactions with other brokerage firms. But JP Morgan allegedly only saw "massive outflows" of money that were not linked to stock or options trading. SAC ¶¶ 157-58.

The SAC also alleges that JP Morgan knew that Madoff and BLMIS were fiduciaries, and that JP Morgan profited from its business with BLMIS and Madoff in various ways. According to the SAC, several JP Morgan individuals, including Hogan, were responsible for reviewing JP Morgan's structured financial products related to BLMIS feeder funds. SAC ¶¶ 192-203. JP Morgan invested in several BLMIS feeder funds and used these funds for issuing its own financial products. SAC ¶¶ 209-15. The SAC alleges that JP Morgan performed due diligence on BLMIS prior to investing in feeder funds, and would have known of the illegal activities by BLMIS at some point between 2006 and 2007 because, among other things, the BLMIS returns were "too good to be true," BLMIS was audited by an obscure firm, and there were rumors that Madoff was running a Ponzi scheme. SAC ¶ 216. JP Morgan allegedly explored deals with other BLMIS feeder funds and conducted only preliminary due diligence into the funds and BLMIS's investment strategy. SAC ¶¶ 222-23. The SAC alleges that JP Morgan failed to receive full responses after making due diligence requests of the feeder funds. SAC ¶¶ 258, 260-61.

The SAC alleges that in the fall of 2008, JP Morgan began withdrawing its investments from BLMIS feeder funds. JP Morgan withdrew several millions of dollars, about 80% of its investment, leaving only about $35 million in BLMIS feeder

funds. SAC ¶¶ 276-79, 284; SAC, Ex. C ¶ 66. Between September 2008 and December 11, 2008, the height of the economic crisis, the balance of the 703 Account began to decrease as investors withdrew their funds. SAC ¶ 290. The SAC points to statements made by other JP Morgan employees after Madoff's arrest in which the employees indicated they had been fortunate and correct in withdrawing JP Morgan's investments and had "got[ten] this one right." SAC ¶ 307. The SAC alleges that employees at JP Morgan touted their refusal to invest with BLMIS to JP Morgan clients and indicated they had been alarmed by several red flags. SAC ¶¶ 315-16.

The plaintiffs bring their action on behalf of a proposed class consisting of persons or entities who "directly, had capital invested with BLMIS, as of December 12, 2008, and who were 'net winners.'" SAC ¶ 328. The SAC alleges that there are approximately 2,500 members in the proposed class. SAC ¶ 330.

**B.**

The SAC outlines the history of actions by other former BLMIS investors that bear upon important issues in this case. The plaintiffs point out that in Picard v. JP Morgan Chase & Co., 721 F.3d 54 (2d Cir. 2013) the Court of Appeals concluded that only customers of BLMIS, not the Trustee, could assert claims against JP Morgan. SAC ¶ 37. Two class actions, on behalf

of BLMIS investors, were brought against JP Morgan in the Southern District of New York and were consolidated in December 2012, the <u>Hill</u> and <u>Shapiro</u> cases. <u>Shapiro v. JP Morgan Chase & Co.</u>, No. 11-cv-8331 (CM)(MHD), Dkt. No. 6 (S.D.N.Y. Dec. 5, 2011). The SAC alleges that the actions were brought on behalf of a proposed class that included both net winners and net losers of the Ponzi scheme. SAC ¶ 38. According to the SAC, the class was subsequently redefined in March 2014, to include only net losers, and the Southern District of New York approved a class settlement. SAC ¶ 40. Net winners were excluded from the settlement. SAC ¶ 40. The Southern District of New York approved the settlement over the objections of the net winners. The Court concluded that the net winners did not have standing to opt out of a class that did not include them. SAC ¶ 41.

This case, the <u>Friedman</u> case brought against JP Morgan and the individual defendants on behalf of net winners of the Madoff Ponzi scheme, was filed in the District of New Jersey on March 28, 2014, four days after the <u>Shapiro</u> settlement was finalized. <u>See</u> Dkt. No. 1; <u>Shapiro v. JP Morgan Chase & Co.</u>, No. 11-cv-8331(CM)(MHD), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014). Also on March 28, 2014, another case on behalf of net winners of the Madoff Ponzi scheme was filed in the Middle District of Florida against JP Morgan and the individual defendants. <u>Dusek v. JP</u>

13

Morgan Chase & Co., No. 2:14-CV-184-FTM-29CM, Dkt. No. 1. (M.D.
Fla. Mar. 28, 2014). The Friedman case was transferred to the
Southern District of New York on July 28, 2015. Dkt. No. 52. The
District Court for the Middle District of Florida declined to
transfer the Dusek case to the Southern District of New York.
Dusek, No. 2:14-CV-184-FTM-29CM, Dkt. No. 68 (M.D. Fla. Jan. 16,
2015).

On September 11, 2015, the defendants in the Friedman case
moved to dismiss the SAC. On September 11, 2015, the plaintiffs
moved to transfer the Friedman case to the Middle District of
Florida. Dkt. No. 66.[2] On September 17, 2015, the District Court
for the Middle District of Florida dismissed all the claims in
Dusek v. JP Morgan Chase & Co., 132 F. Supp. 3d 1330 (M.D. Fla.
2015), appeal pending, 15-14463 (11th Cir. 2016). As a result,
the defendants submitted a letter on September 18, 2015, a day
after Dusek was issued and a week after filing their moving
papers, explaining the import of the Dusek decision and
proposing to elaborate on its impact on the SAC in the Reply.
See Dkt. No. 72. The plaintiffs addressed the Dusek decision in
their Brief in Opposition to the Motion to Dismiss. In their
Reply, the defendants argued that the Friedman plaintiffs'
claims are barred by collateral estoppel, and that the Friedman

_____

[2] The plaintiffs withdrew the motion on October 7, 2015, after the Dusek case
had been dismissed in Florida. Dkt. No. 78.

14

plaintiffs cannot relitigate the merits of their federal claims because those claims were dismissed in Dusek. Arguments raised for the first time in a reply are generally not considered. The reason the defendants raised this argument so late is that the district court in Dusek rendered a decision after the defendants had initially made their motion to dismiss. Although the plaintiffs had the opportunity to address the Dusek decision in their papers, they did not have an opportunity to respond to the defendants' collateral estoppel argument. It would therefore be inappropriate to dismiss the plaintiffs' claims on collateral estoppel grounds. This Court will, however, consider the Court's reasoning in the Dusek opinion. The parties agree that the Dusek and Friedman cases raise similar or identical claims and issues arising from the same set of facts and allegations.

### III.

The gist of the Friedman class complaint is that JP Morgan was aware, or should have been aware, that Madoff and BLMIS were not conducting a legitimate investment advisory business because JP Morgan had access to BLMIS's bank accounts and would have realized that BLMIS was not using customer funds to execute trades. The main claim asserted in the SAC seeks to hold the defendants liable as control persons under the federal securities laws because JP Morgan could have allegedly put an

15

end to the Madoff Ponzi scheme by terminating its banking
relationship with Madoff and BLMIS. The SAC alleges that JP
Morgan knew about the fraud in view of all the red flags that
were apparent to JP Morgan. The state law claims for breach of
fiduciary duty, aiding and abetting embezzlement, state law RICO
violations, and federal RICO violations are premised on the
allegation that JP Morgan was not only aware of the fraud but
also facilitated BLMIS's and Madoff's activities by investing in
BLMIS feeder funds and by failing to report suspicious banking
activity to the Securities and Exchange Commission ("SEC").

**A.**

**(1)**

The defendants move to dismiss Count One, the plaintiffs'
Section 20(a) Control-Person claim, as untimely.

The plaintiffs allege that the defendants are liable under
Section 20(a) of the Exchange Act because they controlled Madoff
and BLMIS, and Madoff and BLMIS violated Section 10(b) and Rule
10b-5. Section 20(a) provides that:

> Every person who, directly, or indirectly,
> controls any person liable under any
> provision of this chapter or of any rule
> or regulation thereunder shall also be
> liable jointly and severally with and to
> the same extent as such controlled person
> to any person to whom such controlled
> person is liable . . . unless the
> controlling person acted in good faith and
> did not directly or indirectly induce the

16

> act or acts constituting the violation or
> cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control

person liability, a plaintiff must show (1) a primary violation

by the controlled person, (2) control of the primary violator by

the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled

person's fraud." ATSI, 493 F.3d at 108; see also Plumbers, 89

F. Supp. 3d at 621.

Private actions under Sections 10(b) and 20(a) of the

Exchange Act are subject to a two-year statute of limitations

and a five-year statute of repose. In re Bear Stearns Cos., Inc.

Sec., Derivative, & ERISA Litig., 995 F. Supp. 2d 291, 299

(S.D.N.Y. 2014) (collecting cases); Pro Bono Invs., Inc. v.

Gerry, No. 03-cv-4347 (JGK), 2005 WL 2429787, at *7 n.5

(S.D.N.Y. Sept. 30, 2005); Marcus v. Frome, 329 F. Supp. 2d 464,

475 (S.D.N.Y. 2004). The Sarbanes-Oxley Act of 2002 ("SOX"),

codified at 28 U.S.C. § 1658(b), provides that

> a private right of action that involves a claim of
> fraud, deceit, manipulation, or contrivance in
> contravention of a regulatory requirement concerning
> the securities laws . . . may be brought not later
> than the earlier of (1) 2 years after the discovery of
> facts constituting the violation; or (2) 5 years after
> such violation.

28 U.S.C. § 1658(b) (emphasis added); Dekalb Cty. Pension Fund

v. Transocean Ltd., 817 F.3d 393, 398 (2d Cir. 2016), as amended
(Apr. 29, 2016). "[C]ourts in this district have treated Section
1658(b)(2) as a statute of repose and [ ] stated that the five-
year period begins to run from the time that the allegedly
fraudulent representations were made." In re Longtop Fin. Techs.
Ltd. Sec. Litig., 939 F. Supp. 2d 360, 378 (S.D.N.Y. 2013)
(internal quotation marks omitted). SOX extended from three to
five years the statute of repose that previously applied to
securities violations, including violations of Sections 9(f) and
18(a) of the Exchange Act, and which had been held to apply by
analogy to implied private rights of action under Section 10(b).
Dekalb, 817 F.3d at 401-02.

        The plaintiffs contend that the statute of repose in
Section 1658(b)(2) does not apply to their Section 20(a) claim
because Section 1658(b)(2) applies only to a "private right of
action that involves a claim of fraud, deceit, manipulation, or
contrivance." According to the plaintiffs, their control-person
claim under Section 20(a) is not a fraud claim and is not
subject to the statute of repose. The plaintiffs contend that
the four-year general statute of limitations period in 28 U.S.C.
§ 1658(a) for federal claims should apply instead.

        The plaintiffs' argument that the Section 20(a) claim is
not subject to the five-year statute of repose in 28 U.S.C.

§ 1658(b)(2) has no merit. Section 1658(b)(2), by its plain terms, applies to "a private right of action that <u>involves a</u> <u>claim of fraud</u>." 28 U.S.C. § 1658(b)(2)(emphasis added). The SAC alleges that "[t]he Defendants were culpable participants in Madoff's and BLMIS'[s] wrongful, manipulative, and deceptive conduct." SAC ¶ 360. In <u>Dekalb</u>, the Court of Appeals for the Second Circuit concluded that Section 1658(b) applies to claims under Section 9(f) of the Exchange Act for manipulation of stock prices, and to claims under Section 18(a) of the Exchange Act for misleading statements in a registration statement, because both sections created essentially fraud claims. <u>Dekalb</u>, 817 F.3d at 403-07.  However, the Court of Appeals held that Section 1658(b) did not apply to claims under Section 14 of the Exchange Act for misleading statements in a proxy statement, because liability can be imposed under Section 14(a) for negligence in drafting a proxy statement; fraud is not required. <u>Id.</u> at 408-09 & n.95. Like Section 9(f) and 18(a) claims, a Section 20(a) claim "involves a claim of fraud." A Section 20(a) claim requires fraudulent conduct by the primary wrongdoer and culpable participation by the alleged control person. <u>ATSI</u>, 493 F.3d at 108. Thus, a Section 20(a) claim "is a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance" and is governed by the statute of repose in Section

19

1658(b). See Dusek, 132 F. Supp. 3d at 1347-48; In re Keithley Instruments, Inc., Derivative Litig., 599 F. Supp. 2d 875, 902 n.22 (N.D. Oh. 2008) ("Plaintiffs' claims for control person liability under Section 20(a), which assert derivative liability for other violations of the Exchange Act, are subject to the same statute of repose as the Rule 10b-5 claims. In re MBIA Inc. Sec. Litig., No. 05-cv-03514(LLS), 2007 WL 473708, at *9 (S.D.N.Y. Feb. 14, 2007).").

Under the five-year statute of repose in 28 U.S.C. § 1658(b), the plaintiffs' claims against the defendants are time-barred. The Madoff arrest took place on December 11, 2008, the last date on which there could have been a securities violation giving rise to control person liability. Under Section 1658(b)(2), the plaintiffs' right to bring a control-person claim against the defendants expired on December 11, 2013.

The plaintiffs argue, however, that the five-year statute of repose should be tolled under American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974). In American Pipe, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Id. at 554. The plaintiffs argue that they were members of the Shapiro class in

20

the case filed in 2011, while the clock for the statute of repose was otherwise ticking, and that as a result, the statute of repose should be tolled during the pendency of the Shapiro action. However, as the defendants point out, the Court of Appeals for the Second Circuit held that the American Pipe tolling rule does not apply to statutes of repose because statutes of repose, unlike statutes of limitations, "affect the underlying right, not just the remedy, and thus they run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action." Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc., 721 F.3d 95, 106 (2d Cir. 2013)(internal citation omitted).[3] "In other words, while statutes of limitations are often subject to tolling principles, a statute of repose extinguishes a plaintiff's cause of action after the passage of a fixed period of time, usually measured from one of the defendant's acts." Id. (internal quotation marks

---

[3] Although IndyMac analyzed the three-year statute of repose in Section 13 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77m, 721 F.3d at 100, "the Second Circuit's reasoning in IndyMac was based on general principles applicable to all statutes of repose." See In re Bear Stearns, 995 F. Supp. 2d at 300 (applying IndyMac's rule against tolling to the statute of repose for a Section 10(b) claim). The Supreme Court granted a petition for certiorari in IndyMac, but the Court dismissed the writ as improvidently granted on September 29, 2014. Pub. Emps.' Ret. Sys. of Mississippi v. IndyMac MBS, Inc., 134 S. Ct. 1515 (Mar. 10, 2014), cert. dismissed as improvidently granted, 135 S. Ct. 42 (Sept. 29, 2014).

and citations omitted). The plaintiffs' argument that the statute of repose on their Section 20(a) claim was tolled by the class action in Shapiro is therefore foreclosed by IndyMac.[4]

The plaintiffs acknowledge that their position on tolling the statute of repose is contrary to binding Second Circuit precedent, but they argue that pursuant to Van Dusen v. Barrack, 376 U.S. 612, 639 (1964), this Court should apply the law of the Third Circuit, rather than the law of the Second Circuit. This argument is unavailing.[5] Although this case was originally

---

[4] In Dusek, the district court for the Middle District of Florida considered a virtually identical claim against JP Morgan under Section 20(a) of the Exchange Act. 132 F. Supp. 3d at 1347-48. The district court concluded that the Section 20(a) claim was untimely because the final violation occurred on or before December 11, 2008, and the right to bring the claim expired on December 11, 2013, under 28 U.S.C. § 1658(b). Id. at 1348. The district court also concluded that the American Pipe tolling rule did not apply to toll the statute of repose. Id. at 1349-50. The court reasoned that the Supreme Court and nearly all the Courts of Appeals to have considered the issue, have described American Pipe tolling as an equitable doctrine and therefore it does not extend a statute of repose. Id. at 1350. In Indy Mac, the Court of Appeals for the Second Circuit stated that the American Pipe tolling rule does not apply to statutes of repose regardless of whether the tolling rule is equitable or legal in nature. IndyMac, 721 F.3d at 109; see Dekalb, 817 F.3d at 414.

[5] In any event, the plaintiffs do not point to any cases from the Third Circuit Court of Appeals that are inconsistent with the approach of the Second Circuit Court of Appeals. A district court in the District of New Jersey analyzed a Section 20(a) claim under 28 U.S.C. § 1658(b)(2), concluding, as this Court did above, that the five-year period was a statute of repose and that it applied to a control person liability claim. N. Sound Capital LLC v. Merck & Co., No. 3:13-CV-7240 (FLW) (DEA), 2015 WL 5055769, at *5 (D.N.J. Aug. 26, 2015), appeal filed, (3d Cir. Jan. 15, 2016). However, that court went on to find that the tolling rule under American Pipe is a legal tolling rule, not an equitable tolling rule, and does apply to a statute of repose. Id. at *6-*8. This issue is presently on appeal to the Third Circuit Court of Appeals. As explained in the preceding footnote, the issue of whether American Pipe tolling is legal or equitable is not dispositive in this Circuit and the North Sound Capital decision is contrary to the IndyMac and Dekalb decisions from the Court of Appeals for the Second Circuit.

transferred from the District of New Jersey, the Van Dusen rule provides that a transferee court is obligated to apply "the state law that would have been applied if there had been no change of venue." Id. The Van Dusen rule does not apply to federal law.

> Although federal courts sometimes arrive at different constructions of federal law, federal law (unlike state law) is supposed to be unitary. Thus, the rule of Van Dusen does not apply by analogy where a case is transferred under § 1407 to a federal court that has a different construction of relevant federal law than the federal court in which the action was filed.

Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (per curiam). The plaintiffs contend that Menowitz does not apply to this case because the transfer was made pursuant to Section 1404, not Section 1407. But in the Section 1404 context, courts also have concluded that the transferee court should apply its own interpretation of federal law. See Ctr. Cadillac, Inc. v. Bank Leumi Tr. Co. of N.Y., 808 F. Supp. 213, 224 (S.D.N.Y. 1992), aff'd, 99 F.3d 401 (2d Cir. 1995). When an action is transferred pursuant to Section 1404(a), "the weight of well-reasoned authority supports the application of the substantive federal law of the transferee court. . . . Federal courts are competent to decide issues of federal law and should not be placed in the awkward position of having to apply the federal law of another circuit when it conflicts with their own circuit's

23

interpretation." Id.; see also Sharette v. Credit Suisse Int'l, 127 F. Supp. 3d 60, 74 (S.D.N.Y. 2015); Nw. Mut. Life Ins. Co. v. Bank of Am. Sec. LLC, 254 F. Supp. 2d 390, 396-97 (S.D.N.Y. 2003) (collecting cases). Therefore, the precedent from the Court of Appeals for the Second Circuit is controlling in this case. Accordingly, the five-year statute of repose bars the plaintiffs' Section 20(a) claim because the statute expired in December 2013, the claim was not filed until March 2014, and the statute of repose cannot be tolled under Indymac. Therefore, the Section 20(a) claim should be dismissed as untimely.

Moreover, American Pipe tolling would not help the plaintiffs in this case. The plaintiffs' Section 20(a) claim would still be time-barred. Tolling is available only when the earlier-filed class action "involved exactly the same cause of action subsequently asserted" in the latter action. In re Bear Stearns, 995 F. Supp. 2d at 303 (internal quotation marks and citations omitted); see also Johnson v. Ry. Express Agency., Inc., 421 U.S. 454, 467 (1975); Card v. Duker, 122 F. App'x 347, 349 (9th Cir. 2005) ("The Supreme Court has thus not extended tolling due to class litigation beyond American Pipe's narrow allowance for identical causes of action brought where the class was decertified.").

The Shapiro putative class asserted several state law causes of action for breach of trust, aiding and abetting embezzlement, aiding and abetting breach of fiduciary duty, conversion, aiding and abetting conversion, unjust enrichment, breach of fiduciary duty, commercial bad faith, and gross negligence. Chaitman Decl., Ex. C. The plaintiffs in this case, the Friedman plaintiffs, argue that their Section 20(a) claim is "substantially similar" to the claims of the Shapiro plaintiffs because the claims in Shapiro and the claims in this case are premised on fraud. But the Shapiro action did not allege that JP Morgan controlled BLMIS, did not assert any federal claims, and did not name Cassa or Hogan as defendants. Therefore, the Section 20(a) claim is not "substantially similar" much less identical to the claims in Shapiro.

The plaintiffs are also not helped by American Pipe tolling because they were never members of the Shapiro class and thus had no basis to rely on the pendency of that lawsuit to avoid bringing their own claims. The defendants point out that the Shapiro class included only so-called "net losers" of the Madoff Ponzi scheme, investors who withdrew less money than they had originally invested with Madoff and BLMIS, as opposed to net winners, investors, like the Friedman plaintiffs, who over time withdrew more money than they had invested. The Friedman

plaintiffs argue that the Shapiro complaint defined the class as a "proposed nationwide class consisting of all persons or entities who, directly, had capital invested with [BLMIS], as of December 12, 2008" and was broad enough to include net winners and net losers. Chaitman Decl., Ex. C ¶ 289.

The plaintiffs' contention that they were members of the Shapiro class is without merit. The Shapiro complaint sought $19 billion in damages. Id. ¶¶ 362, 370. By contrast, in this case, the SAC seeks $64.8 billion in damages, an amount that clearly was not covered by the Shapiro class complaint. SAC ¶ 3. The plaintiffs seek to recover the value of the securities listed on their November 2008 Statements including all the fictitious profits that Madoff fraudulently represented were in the investors' accounts. SAC ¶ 16.

The record of the Shapiro settlement conference further supports the defendants' position that the Friedman plaintiffs were never part of the Shapiro class. A class was never certified for all purposes in Shapiro. Judge McMahon in Shapiro issued an order preliminarily approving a settlement – the court certified the Consolidated Class Action as a class action on behalf of a settlement class comprised of "All BLMIS customers, . . . who directly had capital invested with BLMIS as of the Filing Date and thus, under the net investment method upheld by

the United State Court of Appeals for the Second Circuit, had
net losses ("Net Losses") as of the Filing Date, ("Net
Losers")[.]" <u>Shapiro v. JP Morgan Chase & Co.</u>, No. 11-cv-8331,
Dkt. No. 52, at 2-3 (S.D.N.Y. Jan. 10, 2014).

     Attorney Helen Davis Chaitman, representing net winners,
objected to the settlement in the <u>Shapiro</u> case.[6] In response to
the net winners' objection to the settlement, Judge McMahon
indicated that the net winners could not "object to a settlement
that by its terms d[id] not include [them]." <u>Id.</u>, Dkt. No. 68,
Transcript, at 10 (S.D.N.Y. Mar. 21, 2014). She also stated
that:

> The law is pretty clear that the statute of
> limitations on absent class members tolls with the
> filing of a complaint. If the definition of a class
> member is broad enough in the complaint to include
> you, you certainly have a very good argument to make
> to whatever judge gets that case that it relates
> back, and that you're not time-barred.

<u>Id.</u> In her written memorandum opinion and order approving the
final settlement, Judge Mahon noted that a "decision was made
not to include [the net winners] in the definition of the class"
after the Bankruptcy Court and the Second Circuit Court of
Appeals concluded that net winners should not be allowed to
recover the money they thought they had earned from their BLMIS

---

[6] Ms. Chaitman is also representing the plaintiffs in this case.

27

investments. <u>Shapiro</u>, 2014 WL 1224666, at *9 (citing <u>In re</u>
<u>Bernard L. Madoff Inv. Sec. LLC</u>, 654 F.3d 229, 242 (2d Cir.
2011)). There was "nothing for [the net winners] to 'opt out'
of, because any claims [the net winners] might have against JP
Morgan are by definition not compromised by the settlement." <u>Id.</u>

The <u>Shapiro</u> class complaint, filed November 17, 2011, was
filed nearly three years after the last securities violations on
December 8, 2008, the day of Madoff's arrest and after the
decision of the Court of Appeals on August 16, 2011, in <u>In re</u>
<u>Bernard L. Madoff Investment Securities LLC</u> that would have
alerted the net winner <u>Friedman</u> plaintiffs that they were not
similarly situated to the net loser plaintiffs. Nevertheless,
the <u>Friedman</u> plaintiffs filed their complaint on March 28, 2014,
far outside the period permitted by the statute of repose.
Because the <u>Friedman</u> plaintiffs are not net losers, they were
never part of the conditional class that was approved for
settlement purposes. The <u>Friedman</u> plaintiffs' argument that they
were part of the original class described in the <u>Shapiro</u>
complaint, pre-settlement, ignores the clear import of the class
complaint in <u>Shapiro</u>, filed after the Second Circuit Court of
Appeals concluded that net winners were not similarly situated
to net losers—the class on whose behalf the <u>Shapiro</u> action was
brought. Therefore, for this additional reason, the <u>Friedman</u>

plaintiffs cannot rely on the pendency of the Shapiro class action for tolling purposes.

Therefore, the Section 20(a) claim must be dismissed because it is time-barred.

### (2)

The defendants also argue that the plaintiffs' Section 20(a) claim fails because the SAC does not allege that the defendants controlled BLMIS or that they were culpable participants in Madoff's Ponzi scheme.

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108.

"The weight of well-reasoned authority is that to withstand a motion to dismiss a section 20(a) controlling person liability claim, a plaintiff must allege some level of culpable participation at least approximating recklessness in the section 10(b) context." Edison Fund v. Cogent Inv. Strategies Fund., Ltd., 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008) (internal quotation marks omitted).  While a plaintiff can satisfy the pleading requirement of control by alleging sufficient facts to

29

state a plausible claim of control, the heightened pleading standards of Rule 9(b) and the PSLRA apply to the pleading of culpable participation. Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 437-39 (S.D.N.Y. 2014) ("'culpable participation' is an element of a Section 20(a) claim that must be pleaded with the same particularity as scienter"), aff'd, No. 15-1813 (2d Cir. Apr. 8, 2015); Floyd v. Liechtung, No. 10-cv-4254 (PAC), 2013 WL 1195114, at *6 (S.D.N.Y. Mar. 25, 2013); McIntire v. China MediaExpress Holdings, Inc., 927 F. Supp. 2d 105, 122 (S.D.N.Y. 2013); Cohen v. Stevanovich, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010).

Control is the sine qua non for Section 20(a) liability. "[A] determination of [Section] 20(a) liability requires an individualized determination of a defendant's control of the primary violator, as well as of the defendant's particular culpability." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998). "Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." SEC v. First Jersey Sec., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (internal quotation marks and citation omitted).

"[E]xercise of influence, without power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other direct way, is not sufficient to establish control for purposes of Section 20(a)." In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005). To establish control person liability, actual control is essential, namely actual control over the transactions in question. Id. (collecting cases).

In this case, the SAC alleges that the BLMIS 703 Account, housed at JP Morgan, received deposits and transfers of approximately $150 billion, almost exclusively from BLMIS investors, but the funds were not used for the purchase or sale of stocks, bonds, or other securities as Madoff had promised. SAC, Ex. C ¶ 10. The SAC alleges that the defendants had "the power and ability and the obligation to terminate their banking relationship" with BLMIS, Madoff, and Madoff's associates. SAC ¶ 351. The SAC also alleges that the defendants' control over BLMIS and Madoff is evident because JP Morgan was "essential to the survival" of the Ponzi scheme, the defendants successfully forced Madoff and Levy to stop their illegal round-trip checking transactions, and the defendants had the "ability to shut Madoff down at any point in time." SAC ¶ 355. But these allegations do not point to any of the typical indicia of control such as

showing that JP Morgan was an owner of BLMIS, participated in
BLMIS management, or directed any of the fraudulent activities.
See First Jersey Sec., 101 F.3d at 1472-73; Patriot Expl., LLC
v. SandRidge Energy, Inc., 951 F. Supp. 2d 331, 362 (D. Conn.
2013). To the extent the SAC alleges that JP Morgan could have
ended the Ponzi scheme by investigating BLMIS's fraud and that
JP Morgan was essential to the Ponzi scheme, allegations that a
"scheme to defraud would not have succeeded but-for Defendants'
involvement," are insufficient because "even significant
participation in [a primary violator's] scheme to defraud is not
equivalent to directing [the primary violator] to engage in that
scheme." See Floyd, 2013 WL 1195114, at *6 (internal quotation
marks and citation omitted).

   The court in Dusek similarly noted that the plaintiffs'
allegations that JP Morgan was "indispensable to Madoff's
fraudulent scheme" were "insufficient to show that defendants
had power to control the general affairs of BLMIS or that they
had the requisite power to directly or indirectly control or
influence the specific corporate policy which resulted in the
primary violations." Dusek, 132 F. Supp. 3d at 1351.

   The SAC also alleges that as part of the longstanding
banking relationship between JP Morgan and BLMIS and Madoff, the
defendants "substantially assisted the crimes of Madoff and

BLMIS" by "funneling approximately $250 million into BLMIS" by way of investments into feeder funds and lending $100 million to BLMIS. SAC ¶ 379. But alleging that the defendants were investors in the Ponzi scheme does not show that the defendants had the "power to direct" management and policies or exercise control in any way, beyond the mere exercise of influence. See Alstom, 406 F. Supp. 2d at 487. And the allegation that JP Morgan provided commercial lending services is insufficient to plead control liability. See Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1162 (9th Cir. 1996) (collecting cases where courts "have been very reluctant to treat lenders as controlling persons of their borrowers"); Schlifke v. Seafirst Corp., 866 F.2d 935, 949 (7th Cir. 1989) ("[T]he fact that the Bank extended a loan to a company to finance its investment programs and took measures to secure its loans does not establish actual exercise of control.").

Moreover, the complaint does not plausibly allege any facts that show JP Morgan had specific control over the actions that are the basis of the securities violations by BLMIS and Madoff. In similar cases, courts have looked to specific indicia of control over the securities violations such as approval of the means of raising investment capital and participation in making false disclosures to investors, which are not alleged in this

case. See Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC, 792 F. Supp. 2d 328, 339-40 (D. Conn. 2011); In re Beacon Associates Litig., 745 F. Supp. 2d 386, 411 (S.D.N.Y. 2010) (individual executives of a Madoff feeder fund were alleged to be control persons because they had discretion over investment advice, oversight, and administrative services that the fund provided to clients and the complaint identified specific false statements to clients that were attributable to the directors); Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 413 (S.D.N.Y. 2010). Moreover, as the Dusek court noted, allegations that Madoff refused to allow JP Morgan to conduct due diligence further undercut the plaintiffs' allegations that JP Morgan controlled BLMIS. See Dusek, 132 F. Supp. 3d at 1351; SAC ¶¶ 258, 260-61.

With respect to the culpable participation element of the Section 20(a) claim, although the SAC pleads that JP Morgan had an ongoing banking relationship with Madoff and BLMIS, the SAC fails to allege facts that show that JP Morgan was a culpable participant in the primary violations of BLMIS and Madoff.

"[P]laintiffs must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom the person had control, was engaging in fraudulent conduct." In re

Glob. Crossing, Ltd. Sec. Litig., No. 02-cv-910 (GEL), 2005 WL 1907005, at *5 (S.D.N.Y. Aug. 8, 2005). "Because Section 20(a) liability requires an individualized determination . . . of the defendant [control person's] particular culpability, it stands to reason that an allegation of culpable participation requires particularized facts of the controlling person's conscious misbehavior or recklessness." Special Situations, 33 F. Supp. 3d at 438 (internal quotation marks and citation omitted).

In this case, the SAC alleges that the defendants had certain obligations under federal laws and regulations to monitor and report suspicious activity, particularly activity related to possible money laundering of funds derived from illegal activities. SAC ¶ 67; SAC, Ex. C ¶¶ 5-6. JP Morgan did not make any reports of suspicious activity to the government until after Madoff was arrested. SAC ¶ 112. The SAC alleges that JP Morgan could have discovered the Ponzi scheme and that Madoff was not investing the customers' funds. SAC ¶¶ 349-50 ("At any point in time from the early 1990s through 2008, the Defendants were confronted on a daily basis with documentary evidence that Madoff was not purchasing securities for his customers . . ."); SAC ¶¶ 157-58, 179-80.

These allegations, at most, support an inference that JP Morgan had constructive, not actual, knowledge of the Madoff

Ponzi scheme and that JP Morgan and its employees were negligent, not fraudulent. The capacity to prevent the fraudulent conduct is, without more, insufficient to plead culpable participation in a scheme. Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 486 (3d Cir. 2013) ("[C]ontrary to the Investors' contention, there is no support for the proposition that reckless inaction without knowledge of the underlying fraud is sufficient to establish culpable participation for purposes of a § 20(a) claim.").

The plaintiffs also argue that JP Morgan directly participated in BLMIS's and Madoff's Ponzi scheme by "effectuat[ing] every single fraudulent transfer" of funds to Madoff's coconspirators, and that JP Morgan made "exorbitant profits" through its use of the funds in the 703 Account. Pls.' Opp. at 20. These allegations, however, do not raise an inference that the defendants were culpable participants in the fraud by Madoff and BLMIS for the same reasons courts have rejected similar allegations of fraud and 10b-5 violations against banks. As Judge Schwartz explained, "the Second Circuit has repeatedly held that routine and general benefits that are derived in the ordinary course of business do not constitute the type of 'concrete benefit'" necessary to raise an inference of

fraudulent intent. <u>Schmidt v. Fleet Bank</u>, No. 96-cv-5030 (AGS), 1998 WL 47827, at *9 (S.D.N.Y. Feb. 4, 1998).

> [G]iven that all Ponzi schemes are doomed to collapse, . . . and that a bank cannot reasonably expect to retain the proceeds of a Ponzi scheme as can an individual, logic defeats the inference that [a bank] would expose itself to substantial financial liability and reputational harm by participating in [the] scheme simply for the short-term benefit of having access to additional deposits.

<u>Id.</u> at *10 (internal citation omitted). The more cogent and compelling inference is that Madoff's fraud went undetected, and that the defendants had an "inaccurate understanding" of BLMIS and Madoff's business. SAC, Ex. C ¶ 20; <u>see</u> <u>Meridian Horizon Fund, LP v. KPMG Cayman</u>, 487 F. App'x 636, 641 (2d Cir. 2011) (summary order) (noting Madoff's "proficiency in covering up his scheme and deceiving . . . financial professionals").

Therefore, in addition to being dismissed because it is untimely, Count 1 should also be dismissed because the SAC does not sufficiently allege that the defendants controlled BLMIS and Madoff and that the defendants were culpable participants in Madoff's Ponzi scheme.[7]

---

[7] The <u>Dusek</u> court also concluded that the Section 20(a) claim should be dismissed because the plaintiffs, who were net winners, had insufficiently alleged that they suffered actual damage. <u>Dusek</u>, 132 F. Supp. 3d at 1352-53 ("[P]laintiffs did not suffer any loss with respect to the imaginary profits listed on their account statements."). The <u>Friedman</u> plaintiffs claim that, at the very least, they were deprived of the use of their funds for the years while the funds were invested with BLMIS. It is unnecessary to reach this alternative asserted ground for dismissing Count 1.

**B.**

The defendants move to dismiss Count 9, the Federal RICO claim, arguing that the claim is barred by the PSLRA. Section 107 of the PSRLA provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). This provision of the PSRLA creates a bar to RICO claims that are predicated on the same conduct that can be the basis for a securities fraud action.

The plaintiffs contend that their RICO claim is exempt from the PSLRA bar because the RICO claim is pleaded only in the alternative. They argue that if their allegations do not state a claim for a violation of Section 20(a), then the PSLRA bar cannot apply because they have not alleged "conduct that would have been actionable as fraud." This argument, however, is specious. In <u>MLSMK Investment Co. v. JP Morgan Chase & Co.</u>, 651 F.3d 268 (2d Cir. 2011), the Court of Appeals addressed the issue of whether the PSLRA bar to RICO claims applies to "claims based on conduct that could be actionable under the securities laws even when the [particular] plaintiff . . . cannot bring a cause of action under the securities laws." <u>Id.</u> at 274 (internal quotation marks and citation omitted). The Court of Appeals held that the PSLRA bar applied to a plaintiff who was unable to bring a securities fraud claim against a defendant because the

38

plaintiff asserted a claim for aiding and abetting liability, a ground of liability for which there is no private right of action. The Court of Appeals held that "section 107 of the PSLRA bars civil RICO claims alleging predicate acts of securities fraud, <u>even where a plaintiff cannot itself pursue a securities fraud action against the defendant</u>." <u>Id.</u> at 277 (emphasis added).

The plaintiffs' RICO claim in this case is based on allegations of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. SAC ¶ 428. The plaintiffs allege that Madoff and BLMIS sent misleading communications through the mails to the BLMIS customers. SAC ¶ 426. This is the same conduct that the plaintiffs alleged was part of the underlying alleged primary violation of Section 10(b) of the Exchange Act that the plaintiffs alleged the defendants were responsible for as control persons. SAC ¶¶ 335-45. Stripped of these allegations of securities fraud by Madoff and BLMIS, which the plaintiffs cannot rely upon as a result of the PSLRA bar, the plaintiffs have no RICO claim. The fact that the plaintiffs have not stated a claim for Section 20(a) control-person liability is irrelevant in the same way that it was irrelevant that the <u>MLSMK</u> plaintiff could not state an aiding and abetting claim. The plaintiffs claim in this case, even if pleaded in the alternative, is

foreclosed by the MLSMK holding. See MLSMK, 651 F.3d at 279 (noting that RICO bar came into existence in response to the concern over gamesmanship in pleadings and that the RICO bar applied both when RICO claims were pleaded in the alternative and when a plaintiff pleaded only a civil RICO claim); Dusek, 132 F. Supp. 3d at 1353-54 (dismissing the Federal RICO claim as barred by the PSLRA). Therefore, the RICO claim should be dismissed because it is barred by the PSLRA.

The plaintiffs' RICO claim should also be dismissed because it is time-barred. The statute of limitations for a civil RICO claim is four years. In re Merrill Lynch Litig., 154 F.3d 56, 58 (2d Cir. 1998). The limitations period begins to run when the plaintiff discovers or should have discovered the RICO injury. Id. The plaintiffs argue that the RICO claim only accrued on February 3, 2011, when the Madoff Trustee filed the unsealed complaint against JP Morgan in In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229 (2d Cir. 2011). But the plaintiffs discovered their injury—that they did not have the funds Madoff had purported to invest for them—arising from the Madoff Ponzi scheme on December 11, 2008, when Madoff was arrested, not three years later.[8] Therefore, the Federal RICO claim should be

---

[8] For the reasons explained above, particularly because the Friedman plaintiffs were never part of the Shapiro class and the Shapiro complaint did not include a RICO claim, the statute of limitations on the RICO claim was not tolled during the pendency of the Shapiro class action.

40

dismissed on this ground as well. See Koch v. Christie's Int'l PLC, 699 F.3d 141, 149-51 (2d Cir. 2012).

### c.

The defendants move to dismiss the plaintiffs' state law claims, Counts 2 to 8 and Count 10, because they are barred by SLUSA. The SAC alleges that the defendants violated the NJUSL, SAC ¶¶ 363-66; aided and abetted embezzlement by Madoff and BLMIS, SAC ¶¶ 367-81; aided and abetted breach of fiduciary duty, SAC ¶¶ 382-94; were unjustly enriched by receiving property that they acquired as result of participating in Madoff's Ponzi scheme, SAC ¶¶ 395-402; breached a fiduciary duty to the plaintiffs to prevent misappropriation of funds the defendants knew that BLMIS held in the 703 Account, SAC ¶¶ 403-08; acted in commercial bad faith by facilitating the Ponzi scheme, SAC ¶¶ 409-13; were grossly negligent because despite having knowledge of how Madoff and BLMIS were using the 703 Account, the defendants did not investigate BLMIS or close the account, SAC ¶¶ 414-18; and violated the New Jersey RICO statute, N.J.S.A. § 2C:41-2(c). The gist of the state law claims is that the defendants knew that Madoff and BLMIS were not purchasing securities with the customers' money and were instead embezzling funds and did nothing to intervene despite an obligation to do so. See, e.g., SAC ¶ 384.

SLUSA provides that "[n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). There is no dispute that the current complaint alleges a "covered class action" and that none of the exceptions in the statute apply. SLUSA precludes state-law class action claims that are predicated on allegations of fraudulent securities transactions that would be actionable under the Exchange Act. In re Herald, 730 F.3d 112, 119 (2d Cir. 2013). In Herald, the plaintiffs, investors in the Madoff Ponzi scheme, brought a class action against JP Morgan and Bank of New York, the banks where the BLMIS's accounts were held. Id. at 116-17. The Court of Appeals concluded that

> The complaints, fairly read, charge that JP Morgan and BNY knew of the fraud, failed to disclose the fraud, and helped the fraud succeed—in essence, that JP Morgan and BNY were complicit[] in Madoff's fraud. These allegations are more than sufficient to satisfy SLUSA's requirement that the complaint allege a "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security."

Id. at 119. The Court of Appeals held that even claims "sounding in negligence, breach of fiduciary duty, and the like" were precluded under SLUSA because "it is obvious that the banks'

42

liability, under any claim, is premised on their participation in, knowledge of, or, at minimum, cognizable disregard of Madoff Securities' securities fraud." Id. at n.7.

In this case, the plaintiffs acknowledge that "some" of their claims are precluded under SLUSA but contend that other claims that are "not fraud-based" are not precluded. Pls.' Opp. at 32. Although the plaintiffs seek to avoid incorporating the facts alleged in connection with the Section 20(a) claim and NJUSL claim into their state law claims, see, e.g., SAC ¶ 367, this attempt at artful pleading does not take the state law claims outside the scope of SLUSA. See Herald, 730 F.3d at 119; In re Kingate Mgmt. Ltd. Litig., 784 F.3d 128, 149 (2d Cir. 2015) ("[P]laintiffs do not evade SLUSA by camouflaging allegations that satisfy this standard in the guise of allegations that do not. When the success of a class action claim depends on a showing that the defendant committed false conduct conforming to SLUSA's specifications, the claim will be subject to SLUSA, notwithstanding that the claim asserts liability on the part of the defendant under a state law theory that does not include false conduct as an essential element—such as breach of a contractual right to fair dealing."). Therefore, the defendants' motion to dismiss the state law claims as precluded by SLUSA is granted. Any further amendment would be

43

futile. Accordingly, Counts 2 to 8 and Count 10 are dismissed with prejudice.

The state law claims should also be dismissed for lack of jurisdiction. The federal claims have been dismissed, and the Court would decline to exercise supplemental jurisdiction over the state law claims. See 28 U.S.C. § 1367(c); <u>Lawtone-Bowles v. City of New York, Dep't of Sanitation</u>, 22 F. Supp. 3d 341, 352-53 (S.D.N.Y. 2014); <u>Nat'l Westminster Bank, PLC v. Grant Prideco, Inc.</u>, 343 F. Supp. 2d 256, 258 (S.D.N.Y. 2004).[9]

---

[9] The plaintiffs conceded at the argument of the current motion that they do not contend that there is jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(9)(A).

44

## CONCLUSION

The Court has considered all of the remaining arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted.** The Clerk is directed to enter judgment dismissing this action and closing the case. The Clerk is also directed to close all pending motions.

**SO ORDERED.**

**Dated:    New York, New York**
              **May 18, 2016**

_____/s/_____

                John G. Koeltl
        United States District Judge